# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| KENNY A. JONES, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:10-CV-402-TLS |
| | ) | |
| CITY OF ELKHART, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Defendants, the City of Elkhart and several officers of the City of Elkhart Police
Department, seek to end this litigation with a judgment in their favor as a matter of law pursuant
to Federal Rule of Civil Procedure 56. (Defs.' Mot. Summ. J., ECF No. 26.) In response to the
Defendants' Motion, the Plaintiff was required to marshal and present the Court with the
evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec.
Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Because the Plaintiff has failed to present such
evidence, the Court will grant the Defendants' Motion.

## BACKGROUND

The Plaintiff, Kenny A. Jones, Sr., alleges that the Defendants violated his Fourth and
Fourteenth Amendment rights. The Introductory Statement of the Amended Complaint states as
follows:

> This is an action for damages sustained by Kenny A. Jones, Sr. a black citizen of the
> United States against police officers of the City of Elkhart, Police Department, who
> early on the morning of October 22, 2008, unlawfully stopped and unlawfully seized
> plaintiff without probable cause, unlawfully searched without probable cause,
> assaulted, conspired, handcuffed, impounded Plaintiff's vehicle, transported Plaintiff
> to police department, charged, processed, and unlawfully imprisoned and held
> Plaintiff without bond for a period of more than ten (10) hours, caused him to be

prosecuted him [sic]. And against the Chief of Police of the Elkhart Police Department as the supervisory officer responsible for the conduct of the defendants to assure proper training or to implement meaningful procedures to discourage lawless official conduct and against the City of Elkhart as the employer of the police personnel who are sued as persons under 42 U.S.C. § 1983.

(Am. Compl. ¶ 1, ECF No. 19.) The Plaintiff further claims that two of the individual officers, Defendant Chris Snyder and Defendant Bryan Moore, conspired to deprive him of his constitutional rights based on racial animus. The Plaintiff alleges that Defendant Jeff Gorball, maliciously and without probable cause, recorded that the Plaintiff refused to deliver a breath sample to determine his blood alcohol content. The Plaintiff has named Dale Flibsen as the "duly appointed Chief of Police of the Elkhart Police Department," and, as such, "the commanding officer of" Defendants Snyder, Moore, and Gorball. Finally, the Plaintiff claims that he was falsely arrested pursuant to an institutionalized practice of the City of Elkhart of stopping citizens without probable cause based on race.

On January 16, 2012, the Defendants moved for summary judgment [ECF No. 26] on all the Plaintiff's claims. The Plaintiff responded with a "Statement of Genuine Issues of Material Fact," which appears to set out the legal claims that the Plaintiff intends to pursue, as well as the facts that he believes support those claims. The issues, as identified by the Plaintiff, are as follows:

1. Whether Snyder and Moore wrongfully stopped, detained, searched, falsely arrested and imprisoned Plaintiff to meet patrol division shift minimums for completed traffic citations pursuant to a wide spread practice that although not authorized by written law or express City of Elkhart Policy, was so permanent and well settled at the time as to constitute a custom or usage with the force of law, caused them to violate Plaintiff's Equal Protection Rights and rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2. Whether probable cause existed for the wrongful stop, detention, search, false arrest and false imprisonment of Jones on October 22, 2008, for speeding, OWI refusal and OWI

endangerment.

3. Whether Defendants Snyder and Moore conspired and agreed under color of state law to violate Plaintiff's rights under the Constitution of the United States and under state law.

4. Whether heel to toe sobriety test constitutes deliberate indifference to Plaintiff's physical limitations and denial of due process under the Fourteenth Amendment to the United States Constitution.

5. Whether Jones refused to take chemical test pursuant to the Indiana law for implied consent to test for intoxication.

6. Whether Snyder violated City of Elkhart Police Department policy by not activating his in-car camera at scene.

7. Whether Snyder, Moore and Gorball acting under color of state law, violated department policy regarding bias-based profiling/discriminatory practices and Plaintiff's Equal Protection Rights under the United States Constitution.

(Pl.'s Statement of Genuine Issues, ECF No. 72.)

On October 8, 2012, the Defendants filed a Response to Plaintiff's Statement of Genuine Issues of Material Facts in Opposition to Defendants' Motion for Summary Judgment [ECF No. 80] and a Reply in Support of Motion for Summary Judgment [ECF No. 81].

## STATEMENT OF FACTS

On October 22, 2008, the Plaintiff was arrested in Elkhart, Indiana for operating while intoxicated (OWI)-refusal and OWI endangering another. At about 4:15AM on October 22, Lt. Chris Snyder of the Elkhart Police Department initiated a traffic stop of the Plaintiff's vehicle for speeding. After talking to the Plaintiff, reviewing the results of a portable breath test (PBT), and administering a field sobriety test, Lt. Snyder read the Plaintiff the Indiana Implied Consent Notice. After some discussion regarding the chemical test and the consequences for refusing to take the test, Lt. Snyder told the Plaintiff he was under arrest for OWI-refusal. Patrolman Bryan

Moore, who was also on the scene, drove the Plaintiff to the police station. At the station, Corporal Jeff Gorball, a certified chemical test operator, ran a refusal ticket.

**A.      The Initial Stop**

On October 21, 2008, the Plaintiff attended an evening class at Ivy Tech Community College in South Bend, Indiana. He left class around 7:30 PM, went home, ate a sandwich and drank a 12-ounce bottle of beer. According to the Plaintiff, this is the only alcoholic beverage that he consumed the entire evening. Around 8:30, he left his house and drove to his sister's house in Elkhart. He arrived around 9:00 and did some homework, used his sister's computer, talked with his sister, and ate a snack. The Plaintiff left his sister's house around 1:00 AM and drove through the McDonald's drive-thru located on Nappanee Street in Elkhart. He ate the food that he purchased while sitting in his car in the McDonald's parking lot. Around 1:15 or 1:20, he left the parking lot and headed south on Nappanee, State Road 19, on his way to South Bend. The Plaintiff states that it took him about ten minutes to get to Mishawaka Road.

According to Lt. Snyder, at about 2:14 AM, he was traveling northbound on State Road 19 south of Leininger in Elkhart. He was driving a fully marked police vehicle and wearing a fully marked police uniform. Lt. Snyder observed the Plaintiff's vehicle traveling southbound just south of Leininger at what appeared to be a speed above the posted speed limit of 35 miles per hour. Lt. Snyder used his moving radar to verify that the vehicle was going 53 miles per hour. No malfunctions were detected with the radar upon being tested with a tuning fork and an internal check before use and after the traffic stop. Lt. Snyder states that he turned around and followed the Plaintiff's vehicle for a couple of blocks, during which time he observed the car

swerving within its lane.

According to the Plaintiff, as he was traveling south on Nappanee, he did not see any police officer traveling northbound on State Road 19 in Elkhart. The Plaintiff did not see any police car turn around and begin to follow him. Instead, what he observed was a car parked off to the side of the road facing north. He states that at no time did he exceed the posted speed limit of 35 miles per hour. According to the Plaintiff's Affidavit:

> After crossing Mishawaka Road, I drove past Snyder sitting, with lights out, on the east side of SR 19 car pointed north across the driveway entrance to Gemeinhardt Co. LLC, 57882 State Road 19 in Baugo Township, Elkhart County, Indiana where Webster intersects with SR 19 from the west. I looked over at Snyder, and Snyder looked over at me as I drove past him. We made eye-to-eye contact. As soon as I passed by him at the intersection of Webster Street and Nappanee, he turned on his headlights, made a U-turn, got behind me, and probably followed me for about five to six seconds before he turned on his emergency lights.

(Pl.'s Aff. ¶ 27, ECF No. 66.) The Plaintiff stopped his car in response to Lt. Snyder's emergency lights.

## B.    The Portable Breath Test and Field Sobriety Test

Lt. Snyder asked the Plaintiff for his license and registration and asked him to put out his cigarette. According to Lt. Snyder, as he talked to the Plaintiff he could smell a strong odor of alcohol coming from the Plaintiff's breath and observed him to have red and watery eyes. When Lt. Snyder asked the Plaintiff if he had been drinking, he responded that he had one beer. Lt. Snyder also noted that the Plaintiff's speech was slow and slurred. Officer Moore appeared at the scene to provide backup. Lt. Synder requested that Officer Moore use Lt. Snyder's portable breath test (PBT) device to determine the Plaintiff's blood alcohol content (BAC). Officer Moore performed the test and advised Lt. Snyder that the Plaintiff's BAC registered .096%. Lt. Snyder

then asked the Plaintiff to step out of his car to perform some field sobriety tests. The Plaintiff contends that it was Lt. Snyder that administered the PBT, and that the first time the Plaintiff saw Officer Moore was after he exited his car upon Lt. Snyder's request. Officer Moore's in-car camera recorded events from this point, but there is no recording of events prior to when Lt. Snyder asked the Plaintiff to exit his car.

As the Plaintiff walked to a paved area off of the road to conduct the test, Lt. Snyder claims that he observed that the Plaintiff's balance was not steady and he was swaying back and forth. The first test that Lt. Snyder wanted the Plaintiff to perform was a one leg stand. Lt. Snyder explained the test and demonstrated it for the Plaintiff. Lt. Snyder then asked the Plaintiff if he had any medical problems that would prevent him from doing the test. The Plaintiff responded that he was extremely bowlegged as a result of a childhood accident in which both legs were broken. Lt. Snyder asked if these injuries would prevent him from standing on one leg, and the Plaintiff responded that they would. Lt. Snyder told the Plaintiff that was okay and he would have him perform a different test. Lt Snyder explained and demonstrated the walk and turn test. The Plaintiff stated that he did not have any questions regarding the test and, in response to Lt. Snyder's question whether anything would prevent him from performing the test, stated no and began to perform the test as demonstrated by Lt. Snyder.

Lt. Snyder noted that the Plaintiff could not keep his hands at his sides, swayed back and forth, and did not touch his heel to his toe on the third through ninth steps on the first pass and the second through eighth steps on the second pass. Lt. Snyder then read the Plaintiff the Indiana Implied Consent Notice, explaining that he had probable cause to believe that the Plaintiff had been operating a motor vehicle while intoxicated, advising the Plaintiff that he had a choice to

submit to chemical test, and explaining the consequences of refusing to consent to the chemical test, including suspension of his license. Lt. Snyder told the Plaintiff that if the chemical test revealed that his BAC was not over the legal limit, they would drive him back to his car. Lt. Snyder then answered further questions from the Plaintiff about the procedures and consequences. When the Plaintiff expressed confusion because he had already taken a breath test, Lt. Snyder explained that the previous test was portable and only gave a general idea of the Plaintiff's BAC.[1]

Lt. Snyder placed handcuffs on the Plaintiff, but expressed that he was not under arrest and was merely being transported to the station because he wanted to take a chemical test. The Plaintiff stated that he did not want to take the test. Lt. Snyder explained that it was up to the Plaintiff, but that Lt. Snyder needed to know whether the Plaintiff was going to take the test, and that it was a yes or no answer. The Plaintiff did not answer the question, but expressed frustration over the options being described. Lt. Snyder then told the Plaintiff that he was under arrest for operating while intoxicated-refusal. Officer Moore then transported the Plaintiff to the station. During the drive, the Plaintiff continued to express confusion over implied consent and why he was being transported if he was not under arrest and had already taken a portable test.

### C.     Events at the Station

The events at the station, inside the room where the chemical testing device is located,

---

[1] A PBT is a handheld apparatus used to conduct breath tests in the field. *State v. Lucas*, 934 N.E.2d 202, 206 (Ind. Ct. App. 2010) (citing Ind. Code § 9–30–7–1(a)). "PBTs are akin to general field sobriety tests and provide officers with a simple method for making a threshold determination as to whether a person has consumed alcohol." *Id.* (citing *State v. Whitney*, 889 N.E.2d 823, 828 (Ind. Ct. App. 2008).

were recorded. Through radio contact with Lt. Snyder, Officer Moore verified that fifteen minutes had passed since Lt. Snyder confirmed that the Plaintiff did not have anything in his mouth.[2] As Officers Moore and Gorball waited with the Plaintiff, there was over ten minutes of discussion, which is summarized below.

Officer Gorball, who was the officer responsible for administering the chemical test, asked the Plaintiff whether it was accurate that the Plaintiff had already told the officers that he was not going to take the test. The Plaintiff responded by stating that he wanted to know what he was being arrested for before he answered any more questions and wanted to see his lawyer. He also relayed the sequence of events at the scene of the traffic stop. Officer Gorball asked Officer Moore if he was present when the Plaintiff advised whether he would take the test, and Officer Moore said the Plaintiff had gone back and forth. The Plaintiff complained that he already blew into a breathalyzer. Officer Moore explained that it was different because it was only a portable test. The Plaintiff expressed confusion why Lt. Snyder's told him he was not under arrest and then had him transported to the station in handcuffs. The officers again discussed implied consent, and the Plaintiff said that he was not saying anything else until he had a lawyer present

---

[2] "The results of a chemical breath test are inadmissible in a prosecution for operating while intoxicated unless the test operator, test equipment, chemicals used in the test, and test techniques have been approved in accordance with the rules promulgated by Indiana University School of Medicine Department of Pharmacology and Toxicology. *Lucas*, 934 N.E.2d at 204; Ind. Code § 9–30–6–5(d). The following is included in the procedures approved by the Department of Toxicology for the administration of a chemical breath test using the B.A.C. Datamaster:

    (1) The person to be tested must:
        (A) have had nothing to eat or drink;
        (B) not have put any foreign substance into his or her mouth or respiratory tract; and
        (C) not smoke;
    within twenty (20) minutes before the time a breath sample is taken.

260 Ind. Admin. Code 1.1-4-8.

and knew what he was being arrested for. Officer Moore said that it was the Plaintiff's right not to say anything or to consent to the test, but that he was not entitled to a lawyer at that time.

Officer Moore again explained the PBT, the development of probable cause at the scene, and the Indiana Implied Consent Law. The Plaintiff stated that he did not consent to anything, and that he was not doing anything else until he saw his lawyer. The Plaintiff then asked what would happen if he consented to more of their tests. Officer Moore said that he already refused. The Plaintiff displayed frustration at this statement, but again stated that he was not taking any more tests and wanted to talk to a lawyer. After more discussion, Officer Moore again stated that the Plaintiff was under arrest for operating while intoxicated-refusal. When Officer Moore asked if that made sense, the Plaintiff continued to express his confusion. Officer Gorball ran an evidence ticket to show that the Plaintiff refused to take the chemical test.

## SUMMARY JUDGMENT STANDARD

The standards applicable to summary judgment are well established. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that

requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). A district

court should deny a motion for summary judgment only when the non-moving party presents

admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*,

652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504,

510 (7th Cir. 2010); *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir.

2010)). Material facts are those that are outcome determinative under the applicable law. *Smith

v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). "Irrelevant or unnecessary facts do not deter

summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d

1099, 1104 (7th Cir. 2008). Additionally, a court is not "obliged to research and construct legal

arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*,

657 F.3d 586, 590 (7th Cir. 2011).


## ANALYSIS

The Plaintiff's federal claims are brought under 42 U.S.C. § 1983. Section 1983 is not

itself a source of substantive rights, but provides "a method for vindicating federal rights

elsewhere conferred by those parts of the United States Constitution and federal statutes that it

describes." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 749 n.9

(1999) (citation and internal quotations omitted); *see also Graham v. Connor*, 490 U.S. 386,

393–94 (1989). To prevail on § 1983 claim, a plaintiff must show that "(1) the defendant

deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2)

the defendant acted under color of state law." *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 791

(7th Cir. 2003) (citation omitted).

**A.      City of Elkhart Police Department Policy Regarding In-Car Camera (Statement of Genuine Issues No. 6)**

The Plaintiff presents evidence that the Elkhart Police Department, through General Order #41.3.8, has a policy regarding the use of squad car video cameras, and that Lt. Snyder violated this policy when he did not record his traffic stop of the Plaintiff. Section 1983 is limited to redressing claims based on federal law. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (stating that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices"). A police department's general order is not a federal law, and does not create federal rights. The Plaintiff does not identify any constitutional right that was violated by Lt. Snyder's failure to record the traffic stop.

**B.      Heel to Toe Sobriety Test (Statement of Genuine Issues No. 4)**

The Plaintiff submits that there is a genuine issue of material fact whether administration of the heel to toe sobriety test constitutes a "deliberate indifference to [his] physical limitations and denial of due process under the Fourteenth Amendment." (Pl.'s Statement of Genuine Issues 20, ECF No. 72.) The Plaintiff cites the Elkhart Police Department's General Order setting forth the various field sobriety tests that an officer may use to assess impairment. Before Lt. Snyder administered one of these tests, the one leg stand, he asked the Plaintiff if there was anything that would cause him not to be able to perform the test. The Plaintiff responded that he could not perform it because he had a condition with his legs, was extremely bowlegged, his legs were broken when he was younger, and his balance was off. Lt. Snyder said that it was not a problem and he would administer a different test; the heel to toe test. Lt. Snyder described the test and asked the Plaintiff if anything would prevent him from performing the exercise. The Plaintiff

responded that there was not. According to the Plaintiff's Affidavit, he knew that he would not be able to walk straight heel to toe, placing one bowleg in front of the other with his toes pointed in the opposite directions and expect to maintain his balance, but thought that if he could come close enough, Lt. Snyder would let him go home. Lt. Snyder reported that the Plaintiff failed the test because he could not keep his hands to his sides, he swayed back and forth, and he did not touch his heel to his toe on the third through ninth steps of the first pass and the second through eighth steps of the second pass. Lt. Snyder then read the Plaintiff the Implied Consent Notice.

The Plaintiff argues that both the one leg stand and the heel to toe test were not appropriate filed sobriety tests for the Plaintiff, and that because the Plaintiff informed Lt. Snyder that he was extremely bowlegged Officer Snyder "knew or should have known that Plaintiff would fail the test because balance was necessary to perform and pass the test." (Pl.'s Statement of Genuine Issues 20.) "The first step in analyzing a § 1983 claim is to identify the specific constitutional rights allegedly infringed." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1994). The Plaintiff claims that Lt. Snyder's action constituted "deliberate indifference" to his physical limitations and denied him "due process under the Fourteenth Amendment." (Pl.'s Statement of Genuine Issues 20, ECF No. 72.) The Plaintiff fails to expound on these assertions, providing no analysis of such claims.

Substantive due process "protects an individual from the exercise of governmental power without a reasonable justification." *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007). The Supreme Court has stated that a plaintiff's substantive due process rights are violated where the alleged abuse of government power "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998); *Rochin v. California*, 342 U.S. 165, 172 (1952). When, as in this case,

"the circumstances permit public officials the opportunity for reasoned deliberation in their decisions . . . the official's conduct [is considered] conscience shocking when it evinces a deliberate indifference to the rights of the individual." *King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007). However, the Supreme Court has stated that "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases." *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975). Where "the nature of the allegations falls clearly within the ambit of those activities regulated by the Fourth Amendment," the Fourth Amendment provides the appropriate standard for evaluating the claim, and "there [i]s no need for the district court to further analyze the case under the strictures of the Fourteenth Amendment." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994); *see also Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 472 (7th Cir. 1998) (stating that the plaintiff could not "use substantive due process to backdoor the district court's conclusion that his arrest satisfies the Fourth Amendment's reasonableness standard").

The Plaintiff has not attempted to show that Lt. Snyder's actions were not part and parcel of a seizure within the meaning of the Fourth Amendment. Additionally, apart from the interests protected by the Fourth Amendment, the Plaintiff would have to establish that Officer Snyder's actions impinged a fundamental liberty interest akin to those set forth in *Washington v. Glucksberg*, 521 U.S. 702 (1997). *See Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 768 (7th Cir. 2004) (noting that the analysis of a substantive due process claim requires a careful description of the liberty interest the plaintiff seeks to protect and a determination whether that interest is fundamental). The Plaintiff has failed to identify any liberty interest that differs in nature from

those protected by the Fourth Amendment. Accordingly, the Court finds that the Plaintiff has not

set forth facts that would support a claim under the Fourteenth Amendment. The Court will

consider the facts surrounding the propriety of administering the test in connection with the

Plaintiff's claim that he was stopped, detained, and arrested in violation of the Fourth

Amendment. In doing so, the Court will analyze whether the tests administered at the scene,

along with the other facts and circumstances within Lt. Snyder's knowledge, were sufficient to

support the Defendants' seizure of the Plaintiff.

## C.     Fourth Amendment (Statement of Genuine Issues 2 and 5)

The Fourth Amendment prohibits unreasonable searches and seizures, including arrests.

But a warrantless arrest is permitted under the Fourth Amendment if the arresting officer has

probable cause. *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001) (citing

*United States v. Watson*, 423 U.S. 411, 417–24 (1976)). Probable cause for an arrest exists if an

officer reasonably believes, in light of the facts and circumstances within his knowledge at the

time of the arrest, that the suspect has committed, or is committing, an offense. *United States v.*

*Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001). Arresting officers may draw reasonable inferences

based on their training and experiences in determining whether suspicious circumstances rise to

the level of probable cause. *Id.* When police officers stop an automobile and detain the occupant

briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v.*

*United States,* 517 U.S. 806, 809–10 (1996). The decision to stop and detain motorists is

reasonable where there is probable cause to believe that a traffic violation has occurred. *Id.* at

810; *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("Probable cause exists when

'the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.'") (quoting *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000)). Any ulterior motive an officer may have for making the stop is irrelevant in the Fourth Amendment analysis. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813).

"Because the issue of whether probable cause for an arrest existed is linked to the determination of whether the arresting officers are shielded from liability by qualified immunity in a § 1983 action, the two issues are often analyzed together." *Thompson v. Wagner*, 319 F.3d 931, 935 (7th Cir. 2003). Qualified immunity shields police officers from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). What this means, is that the Defendant officers are entitled to qualified immunity and the Plaintiff's § 1983 action against them must be dismissed without a trial if a "reasonable officer could have believed that, in light of the facts and circumstances within the officers' knowledge and clearly established law, [the Plaintiff] had committed or was committing an offense." *Thompson*, 319 F.3d at 935 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). "A reasonable but mistaken belief that probable cause exists is sufficient for entitlement to qualified immunity." *Id.* (citing *Hunter*, 502 U.S. at 227). "In cases involving the issue of whether probable cause existed to support an arrest, 'the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed.'" *Id.* (quoting *McDonnell v. Cournia*, 990 F.2d 963, 968 (7th Cir. 1993), and *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992)).

Although the Plaintiff denies that he was speeding because he was always careful to obey the speed limit when traveling that particular route, there is no basis to infer that Lt. Snyder did not reasonably believe that the Plaintiff was speeding. *See Muriel*, 418 F.3d at 724 (courts "need only inquire whether the officer had probable cause to believe that a traffic violation occurred, . . . not whether [the driver] actually was tailgating") (internal citation omitted); *United States v. Cashman*, 216 F.3d 582, 586–87 (7th Cir. 2000) (officer's estimate of the fact undergirding a violation does not need to be "perfectly accurate;" pertinent question is whether it was reasonable for the officer to believe that a violation had occurred). The Plaintiff has not presented facts to refute that Lt. Snyder visually observed the Plaintiff's speed and believed it to be in excess of the posted speed limit, or that Lt. Snyder's radar device displayed that he was traveling well over the posted speed limit at 53 miles per hour. Moreover, Lt. Snyder states in his affidavit that his radar gun was tested with a tuning fork and an internal check before his use and after the traffic stop with no malfunctions detected. In his Statement of Facts, the Plaintiff asserts that the radar instrument used by Lt. Snyder on October 22, 2008, was "not tested or covered by valid Certificate of Calibration that met manufacturer's specifications at time used." (Pl.'s Statement of Genuine Issues of Material Facts ¶ 38, ECF No. 72.) The only exhibit the Plaintiff designates in support of this statement, an unauthenticated Certificate of Calibration dated August 23, 2001, and expiring on May 31, 2002, does not support the assertion that no such Certificate existed in October 2008. The Plaintiff has not raised a genuine issue of material fact whether Lt. Snyder's reliance on his radar gun was unreasonable.

With respect to the initial stop, the Plaintiff disputes Lt. Snyder's account of where his squad car was situated when Lt. Snyder first observed the Plaintiff's car. The Plaintiff argues

that Lt. Snyder's car was actually situated outside the jurisdiction and corporate limits of the City of Elkhart. Even assuming that the Plaintiff's observations created a genuine issue of fact, he does not explain how the dispute goes to an outcome determinative fact or impacts the constitutionality of the traffic stop. The Plaintiff's reason for noting the location of Lt. Snyder's car appears to be related to an Elkhart Police Department General Order that directs police officers to stay within the city limits of Elkhart unless permission is granted to leave the limits, which is generally only granted by the on duty supervisor. As the Court has already noted, § 1983 is limited to redressing claims based on federal law, and a police department's general order is not a federal law and does not create federal rights. Because the summary judgment materials show that, regardless of his exact location, Lt. Snyder possessed an objectively reasonable belief that the Plaintiff was speeding based on his visual estimation and radar reading, Lt. Snyder did not violate the Plaintiff's Fourth Amendment rights by stopping him.

The Plaintiff argues that the Defendants violated his Fourth Amendment rights by arresting him for OWI-refusal and OWI endangerment. He submits that there was no probable cause to believe he was intoxicated, and that he was not given adequate opportunity to submit to a chemical test. The designated evidence, however, shows that the Defendants had a reasonable basis to conclude that probable cause existed to arrest the Plaintiff for the offenses. The Plaintiff attacks the Defendants' basis for probable cause by stating that it was Lt. Snyder, not Officer Moore, who administered the PBT. The impact of this contention is not clear. It is undisputed that the Plaintiff took a PBT. He referred to at length in his conversations with the officers at the scene, during transport, and at the station. At one point when he was at the station, he even referenced that it was Officer Moore who had told him to blow into the device. Confusion

regarding who administered the test cannot justify ignoring the fact that a test was administered. If Lt. Snyder himself administered the test he would certainly have knowledge of the results of that test and be able to use it in consideration of the totality of circumstances to determine whether probable cause existed to arrest the Plaintiff.

Additionally, the Plaintiff has no evidence refuting the results of the test, specifically that the portable device indicated that his BAC was .096%. The Plaintiff argues that he was not told the results of the test, but that point is not disputed or relevant, except to show the Plaintiff did not have personal knowledge of the number the device registered. The Plaintiff contends that the officer who administered the test directed the Plaintiff to blow in the unit, looked at the device, and then pushed a button on it. He states that this was done twice, but that he blew into the device longer the second time. Lt. Snyder then walked back to his car. In his Statement of Facts, the Plaintiff maintains that the PBT device that the Elkhart Police Department uses, the Alco-Sensor III, responds within ten seconds on negative samples and within thirty to forty-five seconds on positive sample. (Pl.'s Statement ¶ 95, ECF No. 72.) He states that each time Lt. Snyder had the Plaintiff blow in the PBT, "the result came back as soon as he hit the button." (*Id.*) The Court assumes that the Plaintiff intends this information to create a genuine issue of material fact regarding the results of the PBT. The exhibit that describes the Alco-Sensor III (Ex. 12, not Ex. 13 as cited by the Plaintiff), is not authenticated and there is no indication in the record before the Court that it is the device used by the Elkhart Police Department, nor is there any indication what is meant by a negative sample or positive sample. Even assuming that the Elkhart Police Department used the Alco-Sensor III, what is more problematic for the Plaintiff is that he has no personal knowledge of when the "result came back." He was never shown the

reading on the device. *See* Fed. R. Civ. P. 56(c)(4) (requiring that affidavits used to oppose a motion for summary judgment must be made on personal knowledge); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (affidavit testimony must concern matters within the affiant's personal knowledge). On a motion for summary judgment, a court must not consider parts of an affidavit that fail to comply with the rule. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004). Thus, the Plaintiff's Affidavit on this point does not create a dispute regarding whether the PBT showed that the Plaintiff's BAC was .096%. The Plaintiff's evidence does not create a reasonable inference that Lt. Snyder did not reasonably believe the results of the PBT test. The Plaintiff's BAC, along with Lt. Snyder's observations of the Plaintiff, justified administering a field sobriety test.

The Plaintiff objects to Lt. Snyder's decision to have the Plaintiff perform the walk and turn test. He maintains that Lt. Snyder should have known that the Plaintiff would not be able to perform the test correctly because the Plaintiff already told him that he was extremely bowlegged and could not perform the one leg balancing test. But the video clearly shows, and the Plaintiff admits, that Lt. Snyder explained and demonstrated the walk and turn test and asked the Plaintiff if anything would prevent him from doing the test. The Plaintiff said no, and then proceeded to perform the test. That fact that other tests were also available for Lt. Snyder to choose from does not create an inference that Lt. Snyder was not justified in using the Plaintiff's performance on the walk and turn test to conclude that probable cause existed to believe that the Plaintiff was under the influence of alcohol.

In light of Lt. Snyder's observations, the BAC the Plaintiff registered on the portable test, and the Plaintiff's performance of the walk and turn test, Lt. Snyder reasonably believed that the

Plaintiff had committed the offense of operating his vehicle while intoxicated. Accordingly, he read the Plaintiff the Indiana Implied Consent law, offering him the opportunity to consent to a chemical test, or to refuse with the consequence that his license would be suspended. The Plaintiff claims that he was not provided ample opportunity to consent to the chemical test. The designated evidence does not support the Plaintiff's position.

Indiana's implied consent law provides that a person who operates a vehicle in Indiana impliedly consents to submit to a chemical test. Ind. Code § 9–30–6–1. A law enforcement officer shall offer a chemical test when the officer has probable cause to believe a driver is intoxicated. Ind. Code § 9–30–6–2. If a driver refuses to submit to a chemical test, the arresting officer must inform the driver that a suspension of driving privileges will result upon the refusal to submit to a chemical test. Ind. Code § 9–30–6–7(a). Lt. Snyder twice explained this to the Plaintiff in an attempt to determine whether the Plaintiff consented to taking a chemical test. The Plaintiff's initial response, although unclear, could reasonably be taken as consent. However, when Lt. Snyder placed handcuffs on the Plaintiff and advised that he was not under arrest but was being transported to the station because he wanted to take the test, the Plaintiff stated that he did not want to take the test. After a few more comments from the Plaintiff, Lt. Snyder stated that he needed to know if the Plaintiff consented to the test, and that it was a "yes or no" answer. When the Plaintiff failed to answer the question, Lt. Snyder advised him that he was under arrest for operating while intoxicated-refusal.

Lt. Snyder would have no reason to believe that, having read from the Indiana Implied Consent Card, explaining the implied consent law, and presenting the issue as either a consent (yes) or refusal (no), that anything additional was required to establish the requisite probable

cause to arrest the Plaintiff for OWI-refusal. Officer Moore also engaged the Plaintiff in a discussion about the chemical test when they were at the station. Although at one point Officer Moore said that it was too late to consent to the test, this was after the Plaintiff had repeatedly advised that he was not doing anything else until he saw his lawyer. Officer Moore was trying to help the Plaintiff understand the situation, and the Plaintiff confirmed that he was not taking any more tests. Although the Plaintiff claims that a genuine issue of fact exists whether he actually refused to take the chemical test, the pertinent question is whether the officers could reasonably believe that his actions represented a refusal. Despite numerous explanations regarding his options, the consequences of the alternative options, and opportunity to consent to the chemical test, the Plaintiff continued to make comments that suggested an unwillingness to submit to the test. Even a mistaken belief that probable cause exists is sufficient for qualified immunity if the belief is reasonable. *See Thompson*, 319 F.3d at 935. The Defendants are thus, at the very least, entitled to qualified immunity for believing that probable cause existed to arrest the Plaintiff for OWI-refusal. Additionally, the existence of a reasonable, good faith belief that probable cause existed to arrest the Plaintiff negates any claim for false imprisonment under Indiana law. *See Trobaugh v. Hellman*, 564 N.E.2d 285 (Ind. Ct. App. 1990).

Included in the Plaintiff's submissions are assertions that relate to the amount of force that Lt. Snyder used on the Plaintiff. The Plaintiff claims that Lt. Snyder smacked his open hand down on the Plaintiff's head when he snatched the Plaintiff's skullcap off his head. The Defendants have moved for summary judgment on any claim that they used excessive force during his stop and arrest. They contend that even if the Plaintiff's allegation that Lt. Snyder asked him to open his mouth and looked inside with a flashlight, and snatched his skull cap off

his head are assumed to be true, this does not reach the level of assault, battery, or excessive force under state or federal law. The Plaintiff does not present any analysis in support of a claim for excessive force or violation of state law.

A claim that a police officer has used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a citizen is addressed to the reasonableness of the seizure under the standards established by the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012) (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009)). The material facts of this case do not suggest that Lt. Snyder's actions were objectively unreasonable. There is no claim that he touched the Plaintiff as he looked inside his mouth. Snatching the skullcap off the Plaintiff's head was no more than a minimal touching that would have lasted mere seconds. The Plaintiff's own words suggest that he felt disrespected, not battered. The Plaintiff describes the event in his Affidavit:

> I felt that Snyder's smacking me down on my head was "unappropriate." Snyder's smacking down on my head felt more like a molestation of my manhood, touching me like that. Because he did not have to touch me like that. He could have easily just taken my skullcap and just pulled it off my head. But he took his open hand, palmed it on my head, and snatched it off. He did not ask me to remove my skullcap. He just—he snatched it off. I felt the whole thing was unappropriate.

(Pl.'s Aff. ¶ 32, ECF No. 66.) The Court was unable to locate a single case where such de minimus contact formed the basis of an excessive force claim. The Court has already noted that it is not obliged to research and construct legal arguments for parties, especially those represented by counsel. Given the Plaintiff's failure to present any analysis of such a claim, the

Court will go no further and will grant summary judgment in favor of the Defendants on the excessive force claim raised in the Plaintiff's Complaint.

**D.     Monell Claim Against the City of Elkhart (Statement of Genuine Issues No. 1)**

The Plaintiff has sued the City of Elkhart. A government entity is responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't. of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). A municipality cannot be held liable solely on the grounds of respondeat superior. *Id.* at 691. To hold an entity liable, there must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury. *See Wragg v. Village of Thornton*, 604 F.3d 464, 467–68 (7th Cir. 2010).

The Plaintiff claims that genuine issues of material fact exist regarding whether Lt. Snyder and Officer Moore wrongfully stopped, detained, searched, falsely arrested and imprisoned him so that they could meet patrol division shift minimums for completed traffic citations, which was so well settled and wide-spread of a practice to as to constitute a custom or usage with the force of law. In support of this statement, the Plaintiff offers the Elkhart Police Department's General Order pertaining to its traffic records system, which required the police department to keep traffic enforcement data and to analyze enforcement activity monthly. He further offers a June 21, 2011, Employee Action for Jeffrey Gorball, issued by Lt. T. Thayer.

The Action states that Gorball did not meet his shift minimum for completed traffic citations for the month of July 2010, and warns him to pick up his activity or face future disciplinary action. The Plaintiff argues that Snyder's and Moore's involvement with his traffic stop on October 22, 2008, would be activity that counted toward their shift minimum quotas and overall monthly activity.

The Plaintiff has not offered any evidence showing a direct link between minimum traffic citation requirements and the events of October 22, 2008. *See Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003) (explaining that "a plaintiff must show a 'direct causal link between the municipal policy and the constitutional deprivation,'" *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 510 (7th Cir. 1993), and that "the policy or custom must be the 'moving force behind the alleged constitutional deprivation,'" *Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002)). The policy, if followed, simply requires that the City maintain a system to record traffic records and to analyze traffic enforcement records monthly to support patrol operations, program planning, development of accident and violation countermeasures, and evaluation of program effectiveness. Nowhere does the policy suggest that officers use unlawful criteria to enforce traffic laws. In fact, a separate policy cited by the Plaintiff strictly prohibits bias-based profiling of individuals in the course of performing law enforcement duties. (Pl.'s Statement of Genuine Issues 34, ECF No. 72.) Where the policy relied upon is not itself unconstitutional, such as here, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). There is no evidence that officers routinely ignored citizens' constitutional rights out of

concern for meeting the minimum traffic citation numbers, or that they did so in this case.[3] The

Plaintiff has failed to present any evidence in support of the requisite causal connection between

the City of Elkhart's general orders and his stop and arrest.

The City is entitled to summary judgment on any claim against it based on its traffic

citation policies.


### E.    Racial Profiling/Failure to Train (Statement of Genuine Issues No. 7)

The Elkhart Police Department has a policy against biased-based profiling and

discriminatory practices. The Plaintiff submits that a genuine issue of material fact exists

whether the individual officers violated this policy and the Plaintiff's constitutionally-protected

equal protection rights. In addition to citing to the policy, the Plaintiff designates evidence that

he believes shows that Lt. Snyder and Officer Moore did not receive training on this policy

before 2010. The Plaintiff claims that the "City of Elkhart fails to train in a reasonable manner its

police officers." (Pl.'s Statement ¶ 191, ECF No. 72.)

Summary judgment is the moment in litigation where the non-moving party is required to

marshal and present the court with evidence on which a reasonable jury could rely to find in his

favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The Plaintiff has

made no attempt to develop a failure to train claim against the City. He does not analyze the

facts in accordance with the legal requirements of failure to train claims or present facts in

---

[3] Indeed, as discussed already in this Opinion and Order, the individual officers are not liable on the underlying substantive claims, and thus the Plaintiff cannot recover against the municipality. *See Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir. 2003) ("[A] plaintiff must prove that the individual officers are liable on the underlying substantive claim in order to recover damages from a municipality under either a failure to train or failure to implement theory.") (citing *Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998)).

support of such a claim. As with other claims against municipal entities, a failure to train claim requires that the Plaintiff establish a causal link between the failure and a specific constitutional injury. Specifically, "the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997). Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police. *See Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997).

Any claim that the individual officers engaged in racial profiling and violated the Plaintiff's equal protection rights fares no better. The Equal Protection Clause protects individuals against certain types of discrimination. "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). A claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires a showing of purposeful discrimination. *See, e.g., Crawford–El v. Britton*, 523 U.S. 574 (1998); *Xiong v. Wagner*, — F.3d —, No. 12-1737, 2012 WL 5067755, at *11 (7th

Cir. Oct. 19, 2012) ("To establish a violation of the Fourteenth Amendment's Equal Protection Clause, a plaintiff must demonstrate that a 'state actor has treated him differently from persons of a different race and that the actor did so purposefully.'") (quoting *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 812 (7th Cir. 2001)); *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001) ("To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose."). The Plaintiff does not present any evidence that he was treated differently from members of the unprotected class or that race was a motivating factor for the traffic stop. According to Lt. Snyder, he was unable to observe the race, age, or gender of the person driving the vehicle before his stopped the Plaintiff. The Plaintiff states that he made eye contact with Lt. Snyder before Lt. Snyder began following him. Despite this dispute, there is no evidence that Lt. Snyder's possible observation of the Plaintiff's race was a motivating factor for conducting the traffic stop. *See Chavez*, 251 F.3d at 645 (explaining that discriminatory intent requires that the decisionmaker select a particular course of action because of its adverse effect upon an indentifiable group). There are simply no indications in the record that race was a factor in the decision to stop the Plaintiff. "When a plaintiff fails to produce evidence, the defendant is entitled to judgment; a defendant moving for summary judgment need not produce evidence of its own." *Marion v. Radtke*, 641 F.3d 874, 876–77 (7th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The Plaintiff's speculation cannot support a claim under the Equal Protection Clause, and the Defendants are entitled to summary judgment.[4]

---

[4]The Defendants did not address an equal protection claim in their Motion for Summary Judgment. Nonetheless, the Plaintiff has raised the issue in response to the Defendants' Motion for Summary Judgment. Even without the Defendants' analysis of the issue, it is clear that the Defendants are entitled to judgment as a matter of law on any equal protection racial profiling claim that the Plaintiff has

**F.      Conspiracy (Statement of Genuine Issues No. 3)**

The Plaintiff claims that Lt. Snyder and Officer Moore conspired and agreed under color

of state law to violate his rights under the Constitution of the United States and under state law.

"[C]onspiracy is not an independent basis of liability in § 1983 actions." *Smith v. Gomez*, 550

F.3d 613, 617 (7th Cir. 2008). A party may recover damages under 42 U.S.C. § 1985(3) if two or

more persons conspire for the purpose of depriving the plaintiff of the equal protection of the

laws. *See Xiong v. Wagner*, 2012 WL 5067755, at *11. To recover under § 1985(3), a party must

establish:

> (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of
> persons of equal protection of the laws, (3) an act in furtherance of the alleged
> conspiracy, and (4) an injury to person or property or a deprivation of a right or
> privilege granted to U.S. citizens.

*Id.* (quoting *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1024 (7th Cir. 2000)). Although the

Plaintiff attempts to show, through circumstantial evidence, that the Defendants reached a

meeting of the minds, he does not designate any evidence to show the purpose of the alleged

conspiracy. To establish the  purpose of the conspiracy under prong two, "a plaintiff must

demonstrate racial, ethnic, or other 'class-based invidiously discriminatory animus behind the

conspirators' actions.'" *Id.* (quoting *Brokaw*, 235 F.3d at 1024); *see also Smith*, 550 F.3d at 617

(noting that a conspiracy under § 1985(3) "must be motivated by racial, or other class-based

---

intended to advance. The Plaintiff may argue that he needed more discovery related to the City of
Elkhart's arrest and citation records to establish the proof of such a claim, but the reality is that the
Plaintiff's Complaint does not state a plausible claim of a practice or policy of stopping motorists
regardless of probable clause because they are black. It merely provides a "formulaic recitation of the
elements," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), without sufficient factual allegations to
"raise a reasonable expectation that discovery will reveal evidence," *id.* at 556. The Plaintiff's bare
assertions are not entitled to the assumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009).

discriminatory animus"). As stated earlier, the Plaintiff has not presented any evidence to establish the existence of racial animus on the part of Lt. Snyder or Officer Moore. Accordingly, the Plaintiff's conspiracy claim falls along with his equal protection claim, and summary judgment is granted in favor of the Defendants.

**G.      Defendant Dale Flibsen**

In his Complaint, the Plaintiff names Dale Flibsen, the Chief of Police of the Elkhart Police Department. He alleges that Flibsen was responsible for the training, supervision, and conduct of the other named officers, and that he is sued individually and in his official capacity as the Chief of Police. The only mention the Plaintiff makes of Chief Flibsen in response to the Defendants' Motion for Summary Judgment is to state that he has exclusive control of the Police Department and approves and issues its General Orders.

The Court has already addressed the official capacity claim in its discussion of the Plaintiff's claim against the City of Elkhart. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (stating that official capacity suits are, in essence, suits against the government employer); *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) (noting that the city is the true defendant in official capacity suits against city officials). Accordingly, Flibsen is entitled to summary judgment on any claim against him in his official capacity for the same reasons cited by the Court with respect to the Plaintiff's claims against the City of Elkhart.

Individual liability under § 1983 requires personal involvement in the alleged constitutional violation. For a supervisor to be personally involved in a subordinate's conduct requires that he have known about the conduct and facilitated it, approved it, condoned it, or

turned a blind eye for fear of what he might see. *See Morfin v. City of East Chi.*, 349 F.3d 989, 1001 (7th Cir. 2003); *see also Palmer v. Marion Cnty*, 327 F.3d 588, 594 (7th Cir. 2003) (noting that although direct participation by the sheriff was not necessary, "there must at least be a showing that the [s]heriff acquiesced in some demonstrable way in the alleged constitutional violation"). The Plaintiff has presented no facts to suggest that Chief Flibsen had any personal involvement in the Plaintiff's seizure, or that he was aware of facts that would cause him to believe that the Plaintiff's constitutional rights were being violated but failed to use his authority to stop the violation. Chief Flibsen is entitled to judgment in his favor as a matter of law. In addition, the John Doe Police Chief that the Plaintiff named in his Amended Complaint is not a proper party to this litigation. *See Kennington v. Carter*, 216 F. Supp. 2d 856, 857–59 (S.D. Ind. 2002) (dismissing empty placeholders).

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendants' Motion for Summary Judgment [ECF No. 26]. As no claims remain pending in this litigation, the Clerk will enter judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED on November 28, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION